## IN THE UNITED STATES DISTRICT COURT
### FOR THE SOUTHERN DISTRICT OF INDIANA

| | |
|---|---|
| **BRIAN DELGADO, JUSTIN GOODMAN, TRACEY HASHMAN, VALDIS KREMERS, GARY MISSI, WILLIAM SNYDER, DAVE CRAWFORD, SHANE HARRIS, ANTHONY HERMILLER, HERMAN KLUESNER, CHRISTOPHER LONG, KEVIN PITTMAN, KEVIN PYLE, ADAM SCHULLER, ANDREW SINCLAIR, RICK WEINGART, WILLIAM WOODCOCK, RYAN YANDELL, DAVID YARLOT, JOHN LINDSAY, and ROBERT LANDRUM,** | **Case No.  1:14-cv-01722-SEB-DML** |
| **Plaintiffs,** | |
| **v.** | |
| **DIRECTV, LLC, DIRECTSAT USA, LLC, and MULTIBAND CORP.,** | |
| **Defendants.** | |

## FIRST AMENDED COMPLAINT

Plaintiffs Brian Delgado, Justin Goodman, Tracey Hashman, Valdis Kremers, Gary Missi, William Snyder, Dave Crawford, Shane Harris, Anthony Hermiller, Herman Kluesner, Christopher Long, Kevin Pittman, Kevin Pyle, Adam Schuller, Andrew Sinclair, Rick Weingart, William Woodcock, Ryan Yandell, David Yarlot, John Lindsay, and Robert Landrum, by and through their undersigned counsel, for their individual complaints against DIRECTV LLC ("DIRECTV"); and DirectSat USA, LLC and Multiband Corp., ("Provider Defendants" or "HSP Defendants") (collectively with DIRECTV, "Defendants"); hereby state as follows:

## NATURE OF SUIT

1.      DIRECTV—the largest provider of satellite television services in the United States—is responsible for a far reaching "fissured employment"[1] scheme.  In order to expand and service its customer base (topping more than 20 million domestic subscribers), DIRECTV has engaged tens of thousands of technicians—including each of the Plaintiffs in this case—to install and repair its satellite systems. Although DIRECTV requires these technicians to drive a DIRECTV-branded vehicle, wear a DIRECTV uniform, and perform their work according to DIRECTV's exacting policies and procedures, DIRECTV disclaims any legal relationship with these workers, tagging them instead as "independent contractors" or employees of subordinate entities (including the named service provider Defendants). But it is the economic reality of the relationship—not DIRECTV's self-serving labels—that controls whether Plaintiffs meet the definition (among the broadest ever legislated) of an "employee" under the Fair Labor Standards Act ("FLSA").

2.      Plaintiffs' claims squarely challenge this dangerous trend, and are not the first to do so. The U.S. Department of Labor ("DOL") has made a priority of investigating and exposing multi-party business arrangements that shirk compliance with the FLSA.  *See* http://wage-hour.net/post/2012/09/25/Fissured-Industry-Enforcement-Efforts-Continue.aspx (last visited Feb. 25, 2015).   The DOL's Misclassification Initiative, launched under Vice President Biden's

---

[1] Fissured employment describes the practice of a large company attempting to shed its role as a direct employer and purporting to disassociate itself from the workers responsible for its products (albeit maintaining tight control over the method, manner, quantity, and quality of production). The practice of outsourcing an employer's responsibilities and obligations to subordinate entities and subcontractors is highly profitable for companies like DIRECTV, but results in stagnation of wages and benefits and causes rampant violations of wage-and-hour laws. *See e.g.*, David Weil, *The Fissured Workplace: Why Work Became So Bad for So Many and What Can Be Done to Improve It* (Harvard Univ. Press, Feb. 3, 2014);  David Weil, *Enforcing Labour Standards in Fissured Workplaces: The US Experience*, 22 Econ. & Lab. Rel. Rev. 2, at 33-54 (July 2011).

Middle Class Task Force, is aggressively combating this pervasive issue in order to restore rights denied to individuals.[2]  In September 2011, then-Secretary of Labor Hilda L. Solis announced the signing of a Memorandum of Understanding between the DOL and the Internal Revenue Service (IRS), under which the agencies combine resources and share information to reduce the incidence of misclassification of employees, to help reduce the tax gap, and to improve compliance with federal labor laws.  The DOL's Wage and Hour Division is also partnering with individual states whose workers are being subjected to this practice.[3]

3.     The individual Plaintiffs joined herein intend to prove in this litigation that they are legally employed by DIRECTV and, where applicable, DirectSat and/or Multiband, and are entitled to the overtime and minimum wage protections of the FLSA.

## JURISDICTION AND VENUE

4.     The FLSA authorizes court actions by private parties to recover damages for violation of the FLSA's wage and hour provisions. Jurisdiction over Plaintiffs' individual FLSA claims is based on 29 U.S.C. § 216(b) and 28 U.S.C. § 1331.

5.     Venue in this district is proper pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to the claims alleged herein occurred in this judicial district and Defendants are each subject to personal jurisdiction in this district. **PARTIES**

---

[2] "The misclassification of employees as something else, such as independent contractors, presents a serious problem, as these employees often are denied access to critical benefits and protections—such as family and medical leave, overtime compensation, minimum wage pay and Unemployment Insurance—to which they are entitled. In addition, misclassification can create economic pressure for law-abiding business owners, who often struggle to compete with those who are skirting the law. Employee misclassification also generates substantial losses for state Unemployment Insurance and workers' compensation funds." *See* http://www.dol.gov/opa/media/press/whd/WHD20120257.htm (last visited Feb. 25, 2015); *see generally*, DOL Misclassification Initiative, available at http://www.dol.gov/whd/workers/misclassification/ (last visited Feb. 25, 2015).

[3] *See, e.g.*, DOL Misclassification Initiative, *available at* http://www.dol.gov/whd/workers/misclassification/#stateDetails (last visited Feb. 25, 2015).

6.      Brian Delgado is an individual residing in Hammond, Indiana.

7.      Justin Goodman is an individual residing in Lowell, Indiana.

8.      Tracey Hashman is an individual residing in Eaton, Indiana.

9.      Valdis Kremers is an individual residing in Fishers, Indiana.

10.     Gary Missi is an individual residing in Lanesville, Indiana.

11.     William Snyder is an individual residing in Delphi, Indiana.

12.     Dave Crawford is an individual residing in Fort Wayne, Indiana.

13.     Shane Harris is an individual residing in Huntington, Indiana.

14.     Anthony Hermiller is an individual residing in Leipsic, Ohio.

15.     Herman Kluesner is an individual residing in Jasper, Indiana.

16.     Christopher Long is an individual residing in Indianapolis, Indiana.

17.     Kevin Pittman is an individual residing in Lafayette, Indiana.

18.     Kevin Pyle is an individual residing in Decatur, Indiana.

19.     Adam Schuller is an individual residing in Auburn, Indiana.

20.     Andrew Sinclair is an individual residing in Fort Wayne, Indiana.

21.     Rick Weigart is an individual residing in Fort Wayne, Indiana.

22.     William Woodcock is an individual residing in Kendaville, Indiana.

23.     Ryan Yandell is an individual residing in Ardmore, Oklahoma.

24.     David Yarlot is an individual residing in Auburn, Indiana.

25.     John Lindsay is an individual residing in Wawaka, Indiana.

26.     Robert Landrum is an individual residing in Albion, Indiana.

27.     DIRECTV, Inc. is a Delaware corporation with its principal place of business in

El Segundo, California. DIRECTV, Inc. does business as DIRECTV Home Services. In

December 2011, DIRECTV, Inc. merged with another DIRECTV entity, DIRECTV Operations, LLC. The resulting entity is known as DIRECTV, LLC, which is a Delaware corporation with its principal place of business in El Segundo, California.

28.     Defendant Multiband Corp. ("Multiband") is a Minnesota corporation, with its principal place of business in New Hope, Minnesota.

29.     Defendant DirectSat USA, LLC ("DirectSat") is a Delaware limited liability company with its principal place of business in King of Prussia, Pennsylvania.

30.     All Plaintiffs performed work for DIRECTV and, where applicable, one or more Provider Defendants in Indiana.

31.     All Defendants do business or have done business in Indiana.

**COMMON FACTUAL ALLEGATIONS**

**DIRECTV's Fissured Employment Scheme: The Provider Network**

32.     At all relevant times, Plaintiffs worked as satellite television installation technicians. Plaintiffs' principal job duties as technicians were to install and repair DIRECTV satellite television service.

33.     DIRECTV controls and manages its nationwide corps of service technicians in two ways: (1) by directly employing service technicians ("W-2 Employees"); and (2) through an employment network of service providers (the "Provider Network") consisting of Home Service Providers, including DirectSat and Multiband ("HSPs"), Secondary Service Providers ("Secondary Providers"), subcontractors, and service technicians.

34.     DIRECTV operates its Provider Network nationwide from its headquarters in El Segundo, California.

35. Upon information and belief, at all relevant times, DIRECTV was the primary, if not the only, client of the HSPs and Secondary Providers (HSPs and Secondary Providers are collectively referred to herein as "Providers") and was the source of substantially all of each Provider's income.

36. During the relevant time period, and as alleged in more detail *infra*, many HSPs were subsumed by DIRECTV through a series of mergers and acquisitions.

37. By design, the Provider Network is organized and operated as a top-down structure: DIRECTV sits atop the Provider Network, controlling the employment network through contracts with HSPs and Secondary Providers; the HSPs and Secondary Providers, in turn, enter contracts with a patchwork of largely captive entities that DIRECTV generally refers to as subcontractors; and the subcontractors enter contracts with the technicians who install the satellite television equipment. In some instances, the HSPs or Secondary Providers contract directly with the technicians.

38. DirectSat and Multiband performed similar, middle-management functions between DIRECTV and those technicians described below as being employed by them under the FLSA. In this role, DirectSat and Multiband, independent of each other, each worked directly in the interest of DIRECTV by passing along scheduling from DIRECTV and providing supervision of the respective technicians. That is, DIRECTV set forth the qualification "hiring" criteria for the employees and contractors of DirectSat and Multiband. DirectSat and Mulitband then implemented and enforced those qualifications. Similarly, DIRECTV set the requirements for how the technicians were to perform their work. In turn, DirectSat and Mulitband monitored and enforced compliance with those requirements.

39.     DirectSat and Multiband maintained, among other documents, a contractor file for each technician working under their aegis as an ostensible 1099 subcontractor or "independent contractor" (though, these technicians were actually "employees" under the FLSA). The contents of these contractor files were regulated and audited by DIRECTV. These contractor files are analogous to a personnel file.

40.     DirectSat and Multiband had the power to enter into and terminate contracts with the 1099 technicians working under their aegis. In this way, DirectSat and Mulitband had the power to hire and fire those technicians.

41.     DirectSat and Multiband maintained warehouses and other facilities where the 1099 technicians working under their aegis had to go to pick up certain equipment and receive certain trainings. The equipment belonged to DIRECTV and the trainings were required by DIRECTV.

42.     No matter how employed, whether directly or as part of the Provider Network, each DIRECTV technician must install DIRECTV's satellite television equipment according to the same policies, procedures, practices, and performance standards as required by DIRECTV.

43.     For those technicians who work as part of the Provider Network, DIRECTV's policies, procedures, practices, performance standards, and payment method requirements are described, mandated, and imposed through the Provider Agreements, Secondary Provider Agreements, and Services Provider Agreements.

44.     DIRECTV obligates the Providers to ensure that the technicians perform their work as specified by the Provider Agreements, and, accordingly, the Subcontractor Agreements and Technician Agreements incorporate the provisions of the Provider Agreements.

45.     The Provider Agreements enable DIRECTV to control nearly every facet of the technician's work, down to the "DIRECTV" shirts they are required to wear and the "DIRECTV" ID card they must show customers.

46.     DIRECTV assigns each technician a scope of work described in a Work Order that DIRECTV itself delivers to each technician via a centralized computer software system that DIRECTV controls. DIRECTV mandates particularized methods and standards of installation to assure DIRECTV's equipment is installed according to the dictates of DIRECTV's policies and procedures. As a consequence, each technician's essential job duties are virtually identical no matter where performed and no matter which intermediary the technician is ostensibly working for.

47.     Plaintiffs typically started their workdays after receiving daily work schedules assigned through DIRECTV's dispatching systems. DIRECTV used a database program known as SIEBEL to coordinate the assignment of particular work orders to technicians using each technician's unique "Tech ID Number."

48.     Each technician's unique "Tech ID Number" connects them to a HSP. The HSP serves as a middle-man between DIRECTV and either the W-2 technician or the subcontractor and 1099 technician.

49.     After receiving their daily work schedules, Plaintiffs typically called the customer contact for each of their assigned jobs to confirm the timeframe within which the technician expected to arrive at the customer's home. Plaintiffs then traveled to their first assigned job and thereafter continued to complete the jobs assigned by DIRECTV in the prescribed order on the daily work schedule. Upon arriving at each job site, Plaintiffs were required to check-in by telephone with DIRECTV via its dispatching system. At the end of an assigned job, Plaintiffs

were required to report to DIRECTV that the installation was complete and, thereafter, worked directly with DIRECTV employees to activate the customer's service.

50.     When performing DIRECTV's work, Plaintiffs were required to purchase and wear a uniform with DIRECTV insignia on it. Additionally, Plaintiffs were required to display DIRECTV insignia on vehicles driven to customers' homes for installations.

51.     Although DIRECTV controls nearly every aspect of the technicians' work, Defendants insist that the technicians are not their employees, claiming that in some instances they are "independent contractors."

52.     Plaintiffs will show that the Provider Network is purposefully designed to exercise the right of control over DIRECTV's technician corps while avoiding the responsibility of complying with the requirements of the FLSA.

**DIRECTV's Workforce Consolidation: Acquisition of Providers by Defendants**

53.     DIRECTV's control over its purportedly independent provider partners is integral to its fissured employment scheme. So much so that DIRECTV regularly infuses these partners with what it labels internally as "extraordinary advance payments" in order to keep their dependent operations afloat while feigning an outward appearance of independence. When litigation or other circumstances make the "independent" relationship a negative for DIRECTV, DIRECTV simply absorbs these entities by acquisition.

54.     The absorption by DIRECTV is seamless, simply a resetting of titles without the functional modifications that normally accompany an arm's length acquisition. To date, there are only three "independent" HSPs still in operation—including the named Provider Defendants. Since DIRECTV developed its HSP Network, DIRECTV or one of these three remaining HSPs

has purchased at least thirteen prior HSPs.[4] Below is a description of the prior HSPs for which the Plaintiffs technicians worked and how those HSPs were ultimately acquired by DIRECTV, DirectSat, or Multiband.

**Bluegrass Satellite and Security**

55.    Upon information and belief, Bluegrass Satellite and Security's parent company, JBM, Inc., was acquired by Directech, which was then purchased by Multiband Corporation in December 2009. Multiband ultimately acquired all of Bluegrass Satellite and Security's facilities. After the acquisition, Multiband conducted business out of Bluegrass Satellite and Security's locations, and personnel from Bluegrass Satellite and Security worked for Multiband. Many of Bluegrass Satellite and Security's employees were hired by Multiband.

56.    Upon information and belief, working conditions for installation technicians who worked for Bluegrass Satellite and Security remained substantially the same after Directech, and then Multiband, acquired Bluegrass Satellite and Security. Likewise, technicians, including Plaintiffs, had substantially the same job(s) after Directech, and then Multiband, acquired Bluegrass Satellite and Security. There were no broad changes to job functions, job titles, job responsibilities, and/or supervisors, and technicians' pay remained the same.

**Skylink Ltd.**

57.    Upon information and belief, DirectSat USA, LLC acquired Skylink Ltd. in September 2012, including all of its facilities. After the acquisition, DirectSat USA, LLC conducted business out of Skylink Ltd.'s locations, and personnel from Skylink Ltd. worked for DirectSat USA, LLC. Many of Skylink Ltd.'s employees were hired by DirectSat USA, LLC.

---

[4] These include AeroSat, Bruister, Bluegrass Satellite and Security, ConnecTV, Directech NE, Directech SW, DTV Home Services II, LLC, Halsted Communications, Ironwood Communications, JP&D Digital Satellite, Michigan Microtech, Mountain Satellite and Security, and Skylink.

58.     Upon information and belief, working conditions for installation technicians who worked for Skylink Ltd. remained substantially the same after DirectSat USA, LLC acquired Skylink Ltd. Likewise, technicians, including Plaintiffs, had substantially the same job(s) after DirectSat USA, LLC acquired Skylink Ltd. There were no broad changes to job functions, job titles, job responsibilities, and/or supervisors, and technicians' pay remained the same.

**The Economic Reality: DIRECTV Employs the Technicians Through Its Provider Network**

59.     DIRECTV exerts significant control over the Providers and Plaintiffs regarding the essential terms and conditions of Plaintiffs' employment.

60.     DIRECTV, along with DirectSat and Multiband are, and were at all times relevant herein, in the business of, among other things, providing satellite television service to businesses and consumers. Installation and repair of satellite dishes, receivers, and related equipment is an integral part of DIRECTV's business.

61.     An "employer" includes "any person acting directly or indirectly in the interest of an employer in relation to an employee," 29 U.S.C. § 203(d), and an employee may be employed by more than one employer at the same time. Employment status for purposes of wage and hour law is defined by the real economic relationship between the employer(s) and the employees. Here, through its Provider Network, DIRECTV establishes, defined, and controls the economic relationship between DIRECTV and its technicians. Among other indicia of employment described herein, DIRECTV controls the details of Plaintiffs' day-to-day work and the piece rate compensation method by which technicians are paid for their work.

62.     Through the Providers, DIRECTV exercises significant control over Plaintiffs' daily work lives, including, but not limited to, control over what work Plaintiffs performed,

where that work was performed, when that work was performed, and how that work was performed.

63.     Through the Providers, DIRECTV also determined whether Plaintiffs' work merited compensation. Among other controls, DIRECTV defined Plaintiffs' compensable and non-compensable work and imposed "rollbacks" and "chargebacks," thereby setting Plaintiffs' rate of pay on a piece-rate basis tailored to achieve its business purposes. Through the Provider Network DIRECTV utilized its Providers' payroll and paycheck systems to administer its piece-rate compensation scheme, including issuing paychecks to Plaintiffs.

64.     DIRECTV required Plaintiffs to hold themselves out as agents of DIRECTV.

65.     DIRECTV promulgates detailed instructions for how installations are to be completed. Plaintiffs received these instructions and performed the work as DIRECTV required. By requiring that Plaintiffs comply with DIRECTV's instructions, Plaintiffs were forbidden to exercise meaningful discretion in how they performed installations.

66.     DIRECTV publishes training materials that technicians such as Plaintiffs are required to review.

67.     DIRECTV requires that all technicians pass pre-screening and background checks, and obtain a certification from the Satellite Broadcasting & Communications Association ("SBCA") before that technician may be assigned DIRECTV work orders. This requirement allows DIRECTV to mandate certain training for all technicians.

68.     DIRECTV uses these requirements to control who is hired to install its systems.

69.     DIRECTV utilizes a network of quality control personnel and field managers to oversee the work performed by Plaintiffs.

70.     As described in detail above, DIRECTV, through its SIEBEL system, assigns detailed work schedules to Plaintiffs. Through this system, DIRECTV and the Providers effectively control who continues to perform their work, and can effectively terminate any technician by simply ceasing to issue work to those technicians.

71.     DIRECTV and Providers' quality control personnel reviewed Plaintiffs' work, and imposed chargebacks and/or rollbacks based on those reviews.

72.     Upon information and belief, DIRECTV required, through its Provider Network, technicians who were classified as 1099 independent contractors to sign "Subcontractor Agreements."

73.     Defendants are each engaged in interstate commerce and, upon information and belief, Defendants each gross more than Five Hundred Thousand Dollars in revenue per year.

74.     Defendants' policies and practices accomplish two, interrelated purposes: they ensure DIRECTV controls its technicians' work, while deliberately disclaiming their status as employees under state and federal employment laws.

75.     By imposing its policies and practices—and to mask the economic realities of its employment relationship with Plaintiffs—DIRECTV willfully fails to maintain time records and other employment documentation, thereby saving payroll and other costs.  And by imposing its policies and practices to avoid the reach of state and federal employment laws, DIRECTV willfully fails to pay minimum wage and overtime compensation to Plaintiffs.

76.     Through the Provider Network, DIRECTV imposed its policies and practices uniformly, which created an economic reality driven by its control over Plaintiffs and their work, sufficient to establish that DIRECTV, and where applicable, DirectSat and Mulitband, are Plaintiffs' employers subject to liability under the FLSA.

13

**The Piece-Rate System: DIRECTV's Unlawful Payment Scheme**

77. As with other aspects of Plaintiffs' work, DIRECTV effectively controlled Plaintiffs' pay through the common policies and practices mandated in its Provider Agreements.

78. Every Plaintiff was paid pursuant to the piece-rate payment scheme that is utilized throughout DIRECTV's network.

79. The FLSA permits employers to pay on a piece-rate basis as long as the employer pays for all hours worked, including non-productive hours, and pays a premium for hours worked over forty in a week, based on the employee's regular rate. See 29 U.S.C. § 207(a)(g); 29 C.F.R. 778.318(a).

80. The employer and employee may agree that the piece-rate pay includes pay for productive and nonproductive hours, but where there is no agreement, the FLSA is not satisfied. See 29 U.S.C. § 207(g) (employer's method for calculating the overtime premium must be made "pursuant to an agreement or understanding arrived at between the employer and the employee before performance of the work."); 29 C.F.R. 778.318(c) (where it is "understood by the parties that other compensation received by the employee is intended to cover pay for such hours" . . . . "[I]f that is the agreement of the parties, the regular rate of the piece worker will be the rate determined by dividing the total piece work earnings by the total hours worked (productive and nonproductive) in the workweek.")

81. There was no contract, memorandum, or other document between Plaintiffs and Defendants properly memorializing or explaining this pay system.

82. Under this system, Plaintiffs were not paid for all hours they worked for Defendants. Rather, they were paid on a per-task (a/k/a piece rate) basis for satisfactorily completing a DIRECTV-approved satellite installation.

83.     The piece-rate system only pays technicians for certain enumerated "productive" tasks—tasks that DIRECTV listed on a standardized rate card—but fails to compensate technicians for all necessary work they perform.

84.     In addition to the certain tasks DIRECTV designated as compensable, Plaintiffs performed other work each week during the relevant time period for Defendants, such as assembling satellite dishes, driving to and between job assignments, reviewing and receiving schedules, calling customers to confirm installations, obtaining required supplies, assisting other technicians with installations, performing required customer educations, contacting DIRECTV to report in or activate service, working on installations that were not completed, and working on "rollback" installations where Plaintiffs had to return and perform additional work on installations previously completed.

85.     Plaintiffs were not paid for these integral and indispensable tasks that were necessary to their principal activity of installing and repairing DIRECTV satellite television service.

86.     Although Plaintiffs worked more than forty hours per week, as set forth in more detail below, they were not compensated for these "nonproductive" tasks. Accordingly, to the extent W-2 technician Plaintiffs' pay was translated to a "regular rate" (as required by the FLSA for calculating overtime due to piece-workers), Plaintiffs' regular rate did not reflect compensation for all hours worked and they were not properly compensated for overtime hours.

87.     Defendants did not pay Plaintiffs' wages free and clear. Rather, Plaintiffs were subjected to "chargebacks" wherein Defendants would deduct amounts from Plaintiffs' pay if there were issues with an installation, or questions from the customer, generally up to 90 days after the customer's service was activated. The chargeback would occur for a variety of reasons,

many of which were out of Plaintiffs' control, including, for example, faulty equipment, improper installation, customer calls regarding how to operate their remote control, or a customer's failure to give greater than a 95% satisfaction rating for the services provided by the technician.

88.     In addition to chargebacks, independent contractor Plaintiffs were also required to purchase supplies necessary to perform installations, such as screws, poles, concrete, and cables; and independent contractor Plaintiffs were also required to provide all maintenance and purchase all the gas used in the vehicle they drove between DIRECTV customers' homes. Nor were these independent contractors paid an overtime premium for work done beyond 40 hours in a workweek.

89.     These required business expenses were incurred for DIRECTV's financial benefit and reduced the wages of these technicians.

90.     Plaintiffs, in virtually every workweek, worked more than 40 hours per week for DIRECTV, as alleged in more detail below.

91.     Plaintiffs were not paid the overtime premium required by applicable law for work done beyond 40 hours in a given workweek.

92.     The policy and practice of imposing "chargebacks," failing to compensate Plaintiffs for all hours worked, and failing to reimburse Plaintiffs' necessary business expenses resulted in Plaintiffs routinely working more than forty hours in a work week while being denied overtime pay and being subjected to an effective wage rate below that required by applicable law.

93.     Plaintiffs intend to prove that DIRECTV's piece-rate pay system fails to comply with applicable law, and constitutes an effort to deliberately deny Plaintiffs earned wages and overtime compensation in violation of the FLSA.

## LITIGATION HISTORY

### *Lang v. DIRECTV*

94.     A number of Plaintiffs in this case, including Brian Delgado, Justin Goodman, Tracey Hashman, Valdis Kremers, Gary Missi, and William Snyder, previously opted in to a conditionally certified FLSA action pending in the Eastern District of Louisiana styled *Lang v. DIRECTV, et al.*, No. 10-1085-NJB.  The *Lang* case was pending as a collective action until the court, on September 3, 2013, granted the parties' joint motion decertifying the class, dismissed the opt-in plaintiffs' claims without prejudice to pursue the individual claims raised herein, and ordered the statute of limitations for each opt-in plaintiff to continue to be tolled for 60 days from the date of the order. *Lang v. DIRECTV*, Case No. 10-1085-NJB (E.D. La.) (Docs. 466, 466-1; Doc. 467, Order).

### *Acfalle v. DIRECTV*

95.     Within the 60 days granted by the *Lang* court, Plaintiffs Brian Delgado, Justin Goodman, Tracey Hashman, Valdis Kremers, Gary Missi, and William Snyder filed an action in the Central District of California on November 1, 2013. *Acfalle v. DirecTV*, Case No. 13-8108 ABC (Ex) (Doc. 1) (amended on December 23, 2013, by Doc. 9). On July 22, 2014, the court entered an order "dropping" 277 plaintiffs with FLSA-only claims, dismissing them without prejudice to refile their claims closer to their home states or "where they performed their work." (Doc. 71, at 5, 8.)  The court tolled the statute of limitations for 90 days to permit Plaintiffs to refile their claims. (Doc. 71, at 8.)

96.     Within the 90 days granted by the *Acfalle* court, Plaintiffs Brian Delgado, Justin Goodman, Tracey Hashman, Valdis Kremers, Gary Missi, and William Snyder filed the instant Complaint, joining their individual claims against Defendants.

### Arnold v. DIRECTV

97. Plaintiffs Dave Crawford, Shane Harris, Anthony Hermiller, Herman Kluesner, Christopher Long, Kevin Pittman, Kevin Pyle, Adam Schuller, Andrew Sinclair, Rick Weingart, William Woodcock, Ryan Yandell, David Yarlot, John Lindsay, and Robert Landrum previously filed consents to become party plaintiffs in *Arnold v. DIRECTV*, No. 10-0352-JAR, a collective action pending in the Eastern District of Missouri. Pursuant to a Proposed Case Management Plan and Order (Docs. 200, 216), the court dismissed without prejudice the claims of certain opt-in plaintiffs who did not fit into a subclass, (Doc. 220), including Plaintiffs Dave Crawford, Shane Harris, Anthony Hermiller, Herman Kluesner, Christopher Long, Kevin Pittman, Kevin Pyle, Adam Schuller, Andrew Sinclair, Rick Weingart, William Woodcock, Ryan Yandell, David Yarlot, John Lindsay, and Robert Landrum,[5] without prejudice to pursuing the individual claims raised herein, and ordered the statute of limitations for each opt-in plaintiff to continue to be tolled for 90 days from the date of the order. *Arnold v. DIRECTV*, Case No. 10-0325-JAR (E.D. Mo.) (Doc. 221, Notice of Voluntary Decertification; Doc. 244, Order).

98.     Within the 90 days granted by the *Arnold* court, Plaintiffs Dave Crawford, Shane Harris, Anthony Hermiller, Herman Kluesner, Christopher Long, Kevin Pittman, Kevin Pyle, Adam Schuller, Andrew Sinclair, Rick Weingart, William Woodcock, Ryan Yandell, and David Yarlot, and also John Lindsay and Robert Landrum, joined their individual claims in this action.

---

[5] Plaintiffs Dave Crawford, Shane Harris, Robert Landrum, John Lindsay, Andrew Sinclair, and Ryan Yandell are not identified on the list of opt-in plaintiffs dismissed from *Arnold* because certain of their claims – those for time served as a W-2 employee of a HSP and not for time claimed herein – remain active in *Arnold*.

## PLAINTIFFS' CLAIMS

### Brian Delgado

99.    Plaintiff Brian Delgado is an individual residing in the state of Indiana. Although Brian Delgado was treated as an independent contractor, under the FLSA he was employed by DIRECTV and DirectSat.

100.    In virtually every workweek between approximately September 2010 and the present, Brian Delgado worked more than 40 hours per week as a technician for DIRECTV, DirectSat, Pro Sat Solutions and Sat Pro in the state of Indiana, and was unlawfully deprived of overtime compensation.[6]

101.    In fact, Brian Delgado spent approximately 70 to 80 hours per week performing tasks for the benefit of Defendants. Of those 70 to 80 hours, 30 hours were spent working for DIRECTV and DirectSat's benefit on tasks not assigned a piece rate and which were thus unpaid.

102.    Defendants' employment policies and practices detailed herein (*i.e.*, imposing "chargebacks" in varying amounts but often ranging between $75 and $150 each, failing to compensate Brian Delgado for all hours worked, and failing to reimburse Brian Delgado's necessary business expenses averaging $800 per month) resulted in unlawful reduction of Brian Delgado's compensation.

103.    Brian Delgado does not have all the documents or records possessed by Defendants that bear on his damages. Based on his recollection, Brian Delgado estimates that, in a given workweek, he would work 75 hours, 30 hours of which were unpaid; he would be subject

---

[6] Exceptions to a typical workweek might include days in which work was not performed, *i.e.*, due to weather, a holiday, illness, or otherwise.

to chargebacks of $75 per week; and would be paid $600 per week, which would be reduced by unreimbursed business expenses of $200 per week.

104.    Brian Delgado brings claims against DIRECTV and DirectSat.

**Justin Goodman**

105.    Plaintiff Justin Goodman is an individual residing in the state of Indiana. Although Justin Goodman was treated as an independent contractor, under the FLSA he was employed by DIRECTV and DirectSat.

106.    In virtually every workweek between approximately October 2009 and August 2013, Justin Goodman worked more than 40 hours per week as a technician for DIRECTV, DirectSat, Accusat, LLC, and Dish Solutions in the state of Indiana, and was unlawfully deprived of overtime compensation.[7]

107.    In fact, Justin Goodman spent approximately 55 to 60 hours per week performing tasks for the benefit of Defendants. Of those 55 to 60 hours, 30 hours were spent working for DIRECTV and DirectSat's benefit on tasks not assigned a piece rate and which were thus unpaid.

108.    Defendants' employment policies and practices detailed herein (*i.e.*, imposing "chargebacks" in varying amounts but often ranging between $60 and $73 per week, failing to compensate Justin Goodman for all hours worked, and failing to reimburse Justin Goodman's necessary business expenses averaging $983 to $1083 per month) resulted in further unlawful reduction of Justin Goodman's compensation.

---

[7] Exceptions to a typical workweek might include days in which work was not performed, *i.e.*, due to weather, a holiday, illness, or otherwise.

109.   Justin Goodman does not have all the documents or records possessed by Defendants that bear on his damages. Based on his recollection, Justin Goodman estimates that, in a given workweek, he would work 58 hours, 30 hours of which were unpaid; he would be subject to chargebacks of $67 per week; and would be paid $825 per week, which would be reduced by unreimbursed business expenses of $258 per week.

110.   Justin Goodman brings claims against DIRECTV and DirectSat.

**Tracey Hashman**

111.   Plaintiff Tracey Hashman is an individual residing in the state of Indiana. For a period of time, between approximately 2009 and April 2011, Tracey Hashman was treated as an independent contractor; for another period of time, between June 2011 and August 2011, he was treated as a W-2 technician of Skylink. For all of his time working as a technician, under the FLSA he was employed by DIRECTV and Multiband.

112.   In virtually every workweek between approximately 2009 and August 2011, Tracey Hashman worked more than 40 hours per week as a technician for DIRECTV, Bluegrass, Multiband, Skylink, Gross & McCoy, Wireless Technologies, and Wave Communications primarily in the state of Indiana, and also in Maine, Iowa, and Alabama, and was unlawfully deprived of overtime compensation.[8]

113.   In fact, Tracey Hashman spent approximately 60 to 80 hours per week performing tasks for the benefit of Defendants. Of those 60 to 80 hours, 25 to 30 hours were spent working for DIRECTV and Multiband's benefit on tasks not assigned a piece rate and which were thus unpaid.

---

[8] Exceptions to a typical workweek might include days in which work was not performed, *i.e.*, due to weather, a holiday, illness, or otherwise. Specifically, Tracey Hashman has a gap in his DIRECTV employment from approximately April 2011 to June 2011.

114.    Defendants' employment policies and practices detailed herein (*i.e.*, imposing "chargebacks" in varying amounts but often between $150 and $200 per week, failing to compensate Tracey Hashman for all hours worked, and failing to reimburse Tracey Hashman's necessary business expenses averaging $2042 to $2442 per month) resulted in further unlawful reduction of Tracey Hashman's compensation.

115.    Tracey Hashman does not have all the documents or records possessed by Defendants that bear on his damages. Based on his recollection, Tracey Hashman estimates that, in a given workweek, he would work 70 hours, 28 hours of which were unpaid; he would be subject to chargebacks of $175 per week; and would be paid $900 per week, which would be reduced by unreimbursed business expenses of $561 per week.

116.    Tracey Hashman brings claims against DIRECTV and Multiband.

**Valdis Kremers**

117.    Plaintiff Valdis Kremers is an individual residing in the state of Indiana. Although Valdis Kremers was treated as an independent contractor, under the FLSA he was employed by DIRECTV and Multiband.

118.    In virtually every workweek between approximately May 2009 and May 2010, Valdis Kremers worked more than 40 hours per week as a technician for DIRECTV, Bluegrass, Multiband, Sanders Electronic Inc., and B&C Installations in the state of Indiana, and was unlawfully deprived of overtime compensation.[9]

---

[9] Exceptions to a typical workweek might include days in which work was not performed, *i.e.*, due to weather, a holiday, illness, or otherwise.

119.    In fact, Valdis Kremers spent approximately 50 hours per week performing tasks for the benefit of Defendants. Of those 50 hours, 10 hours were spent working for DIRECTV and Multiband's benefit on tasks not assigned a piece rate and which were thus unpaid.

120.    Defendants' employment policies and practices detailed herein (*i.e.*, imposing "chargebacks" in varying amounts but often ranging between $105 and $200 per week, failing to compensate Valdis Kremers for all hours worked, and failing to reimburse Valdis Kremers' necessary business expenses averaging $1683 to $2083 per month) resulted in further unlawful reduction of Valdis Kremers' compensation.

121.    Valdis Kremers does not have all the documents or records possessed by Defendants that bear on his damages. Based on his recollection, Valdis Kremers estimates that, in a given workweek, he would work 50 hours, 10 hours of which were unpaid; he would be subject to chargeback of $153 per week; and would be paid $1200 per week, which would be reduced by unreimbursed business expenses of $150 per week.

122.    Valdis Kremers brings claims against DIRECTV.

**Gary Missi**

123.    Plaintiff Gary Missi is an individual residing in the state of Indiana. Although Gary Missi was treated as an independent contractor, under the FLSA he was employed by DIRECTV and Multiband.

124.    In virtually every workweek between approximately 2011 and the present, Gary Missi worked more than 40 hours per week as a technician for DIRECTV, Multiband, B&C

Installations, M&M Custom Satellite, and Perfect View in the states of Indiana and Kentucky, and was unlawfully deprived of overtime compensation.[10]

125.    In fact, Gary Missi spent approximately 50 to 60 hours per week performing tasks for the benefit of Defendants. Of those 50 to 60 hours, 8 to 20 hours were spent working for DIRECTV and Multiband's benefit on tasks not assigned a piece rate and which are thus unpaid.

126.    Defendants' employment policies and practices detailed herein (*i.e.*, imposing "chargebacks" in varying amounts but often ranging between $300 and $400 per week, failing to compensate Gary Missi for all hours worked, and failing to reimburse Gary Missi's necessary business expenses averaging $400 per month[11]) resulted in further unlawful reduction of Gary Missi's compensation.

127.    Gary Missi does not have all the documents or records possessed by Defendants that bear on his damages. Based on his recollection, Gary Missi estimates that, in a given workweek, he would work 55 hours, 14 hours of which were unpaid; he would be subject to chargebacks of $350 per week; and would be paid $1050 per week, which would be reduced by unreimbursed business expenses of $100 per week.

128.    Gary Missi brings claims against DIRECTV and Multiband.

**William Snyder**

129.    Plaintiff William Snyder is an individual residing in the state of Indiana. Although William Snyder was treated as an independent contractor, under the FLSA he was employed by DIRECTV and Multiband.

---

[10] Exceptions to a typical workweek might include days in which work was not performed, *i.e.*, due to weather, a holiday, illness, or otherwise.

[11] Exceptions to chargebacks are the weeks Gary Missi worked as a technician for DIRECTV, Multiband, and Perfect View.

24

130.   In virtually every workweek between approximately September 2010 and February 2012, William Snyder worked more than 40 hours per week as a technician for DIRECTV, Multiband, and GMI, Inc. in the state of Indiana, and was unlawfully deprived of overtime compensation.[12]

131.   In fact, William Snyder spent approximately 50 hours per week performing tasks for the benefit of Defendants. Of those 50 hours, 10 hours were spent working for DIRECTV and Multiband's benefit on tasks not assigned a piece rate and which were thus unpaid.

132.   Defendants' employment policies and practices detailed herein (*i.e.*, imposing "chargebacks" in varying amounts but often ranging between $80 and $100 per week, failing to compensate William Snyder for all hours worked, and failing to reimburse William Snyder's necessary business expenses averaging $400 to $1600 per month) resulted in further reduction of William Snyder's compensation.

133.   William Snyder does not have all the documents or records possessed by Defendants that bear on his damages. Based on his recollection, William Snyder estimates that, in a given workweek, he would work 50 hours, 10 hours of which were unpaid; he would be subject to chargebacks of $90 per week; and would be paid $800 per week, which would be reduced by unreimbursed business expenses of $250 per week.

134.   William Snyder brings claims against DIRECTV and Multiband.

**Dave Crawford**

135.   Plaintiff Dave Crawford is an individual residing in the state of Indiana. Although Dave Crawford was treated as a W-2 technician of Skylink, under the FLSA he was employed by DIRECTV and DirectSat.

---

[12] Exceptions to a typical workweek might include days in which work was not performed, *i.e.*, due to weather, a holiday, illness, or otherwise.

136.    In virtually every workweek between approximately August 2009 and September 2012, Dave Crawford worked more than 40 hours per week as a technician for DIRECTV, DirectSat, and Skylink in the state of Indiana, and was unlawfully deprived of overtime compensation.[13]

137.    In fact, Dave Crawford spent approximately 65 hours per week performing tasks for the benefit of Defendants. Of those 65 hours, 5 to 10 hours were spent working for DIRECTV and DirectSat's benefit on tasks not assigned a piece rate and which were thus unpaid.

138.    Defendants' employment policies and practices detailed herein (*i.e.*, failing to compensate Dave Crawford for all hours worked and failing to reimburse Dave Crawford's necessary business expenses averaging $200 to $300 per month) resulted in further unlawful reduction of Dave Crawford's compensation.

139.    Dave Crawford does not have all the documents or records possessed by Defendants that bear on his damages. Based on his recollection, Dave Crawford estimates that, in a given workweek, he would work 65 hours, 8 hours of which were unpaid and he would be paid $600 per week, which would be reduced by unreimbursed business expenses of $63 per week.

140.    Dave Crawford brings claims against DIRECTV and DirectSat.

**Shane Harris**

141.    Plaintiff Shane Harris is an individual residing in the state of Indiana. Although Shane Harris was treated as a W-2 technician of Skylink, under the FLSA he was employed by DIRECTV and DirectSat.

---

[13] Exceptions to a typical workweek might include days in which work was not performed, *i.e.*, due to weather, a holiday, illness, or otherwise.

142.    In virtually every workweek between approximately August 2009 and September 2012, Shane Harris worked more than 40 hours per week as a technician for DIRECTV, DirectSat, and Skylink in the state of Indiana, and was unlawfully deprived of overtime compensation.[14]

143.    In fact, Shane Harris spent approximately 60 to 72 hours per week performing tasks for the benefit of Defendants. Of those 60 to 72 hours, 20 hours were spent working for the benefit of DIRECTV and DirectSat on tasks not assigned a piece rate and which were thus unpaid.

144.    Defendants' employment policies and practices detailed herein (*i.e.*, imposing "chargebacks" in varying amounts but often ranging between $23 and $73 each week, failing to compensate Shane Harris for all hours worked, and failing to reimburse Shane Harris's necessary business expenses) resulted in further unlawful reduction of Shane Harris' compensation.

145.    Shane Harris does not have all the documents or records possessed by Defendants that bear on his damages. Based on his recollection, Shane Harris estimates that, in a given workweek, he would work 66 hours, 20 hours of which were unpaid; he would be subject to chargebacks of $48 per week; and would be paid $800 per week, which would be reduced by unreimbursed business expenses.

146.    Shane Harris brings claims against DIRECTV and DirectSat.

**Anthony Hermiller**

147.    Plaintiff Anthony Hermiller is an individual residing in the state of Ohio. Although Anthony Hermiller was treated as an independent contractor, under the FLSA he was employed by DIRECTV and Multiband.

---

[14] Exceptions to a typical workweek might include days in which work was not performed, *i.e.*, due to weather, a holiday, illness, or otherwise.

148.    In virtually every workweek between approximately September 2009 and July 2012, Anthony Hermiller worked more than 40 hours per week as a technician for DIRECTV, Multiband, and HD Experts in the states of Indiana and Kentucky, and was unlawfully deprived of overtime compensation.[15]

149.    In fact, Anthony Hermiller spent approximately 70 hours per week performing tasks for the benefit of Defendants. Of those 70 hours, 30 hours were spent working for DIRECTV and Multiband's benefit on tasks not assigned a piece rate and which were thus unpaid.

150.    Defendants' employment policies and practices detailed herein (*i.e.*, imposing "chargebacks" in varying amounts but often ranging between $100 and $200 per week, failing to compensate Anthony Hermiller for all hours worked, and failing to reimburse Anthony Hermiller's necessary business expenses averaging $1250 to $1458 per month) resulted in further unlawful reduction of Anthony Hermiller's compensation.

151.    Anthony Hermiller does not have all the documents or records possessed by Defendants that bear on his damages. Based on his recollection, Anthony Hermiller estimates that, in a given workweek, he would work 70 hours, 30 hours of which were unpaid; he would be subject to chargebacks of $150 per week; and would be paid $550 per week, which would be reduced by unreimbursed business expenses of $339 per week.

152.    Anthony Hermiller brings claims against DIRECTV and Multiband.

---

[15] Exceptions to a typical workweek might include days in which work was not performed, *i.e.*, due to weather, a holiday, illness, or otherwise.

**Herman Kluesner**

153.    Plaintiff Herman Kluesner is an individual residing in the state of Indiana. Although Herman Kluesner was treated as an independent contractor, under the FLSA he was employed by DIRECTV and Multiband.

154.    In virtually every workweek between approximately August 2009 and July 2010, Herman Kluesner worked more than 40 hours per week as a technician for DIRECTV and Multiband in the state of Indiana, and was unlawfully deprived of overtime compensation.[16]

155.    In fact, Herman Kluesner spent approximately 60 to 70 hours per week performing tasks for the benefit of Defendants. Of those 60 to 70 hours, 20 to 30 hours were spent working for DIRECTV and Multiband's benefit on tasks not assigned a piece rate and which were thus unpaid.

156.    Defendants' employment policies and practices detailed herein (*i.e.*, failing to compensate Herman Kluesner for all hours worked) resulted in further unlawful reduction of Herman Kluesner's compensation.

157.    Herman Kluesnar does not have all the documents or records possessed by Defendants that bear on his damages. Based on his recollection, Herman Kluesner estimates that, in a given workweek he would work 65 hours, 25 hours of which were unpaid and would be paid $450 per week.

158.    Herman Kluesner brings claims against DIRECTV.

---

[16] Exceptions to a typical workweek might include days in which work was not performed, *i.e.*, due to weather, a holiday, illness, or otherwise.

**Christopher Long**

159.    Plaintiff Christopher Long is an individual residing in the state of Indiana. Although Christopher Long was treated as an independent contractor, under the FLSA he was employed by DIRECTV and Multiband.

160.    In virtually every workweek between approximately September 2009 and January 2014, Christopher Long worked more than 40 hours per week as a technician for DIRECTV, Multiband, B&C Installations, Broadcast Communications, and Global Sky Communications primarily in the state of Indiana, and also in Florida, and was unlawfully deprived of overtime compensation.[17]

161.    In fact, Christopher Long spent approximately 60 to 80 hours per week performing tasks for the benefit of Defendants. Of those 60 to 80 hours, 12 to 40 hours were spent working for DIRECTV and Multiband's benefit on tasks not assigned a piece rate and which were thus unpaid.

162.    Defendants' employment policies and practices detailed herein (*i.e.*, imposing "chargebacks" in varying amounts but often ranging between $50 and $150 per week, failing to compensate Christopher Long for all hours worked, and failing to reimburse Christopher Long's necessary business expenses averaging $1200 per month) resulted in further unlawful reduction of Christopher Long's compensation.

163.    Christopher Long does not have all the documents or records possessed by Defendants that bear on his damages. Based on his recollection, Christopher Long estimates that, in a given workweek, he would work 70 hours, 26 hours of which were unpaid; he would be

---

[17] Exceptions to a typical workweek might include days in which work was not performed, *i.e.*, due to weather, a holiday, illness, or otherwise.

subject to chargebacks of $100 per week; and would be paid $850 per week, which would be reduced by unreimbursed business expenses of $300 per week.

164.    Christopher Long brings claims against DIRECTV and Multiband.

**Kevin Pittman**

165.    Plaintiff Kevin Pittman is an individual residing in the state of Indiana. Although Kevin Pittman was treated as an independent contractor, under the FLSA he was employed by DIRECTV and Multiband.

166.    In virtually every workweek between approximately July 2010 and May 2011, Kevin Pittman worked more than 40 hours per week as a technician for DIRECTV, Multiband, and Gross & McCoy in the state of Indiana, and was unlawfully deprived of overtime compensation.[18]

167.    In fact, Kevin Pittman spent approximately 85 to 100 hours per week performing tasks for the benefit of Defendants. Of those 85 to 100 hours, 35 to 50 hours were spent working for DIRECTV and Multiband's benefit on tasks not assigned a piece rate and which are thus unpaid.

168.    Defendants' employment policies and practices detailed herein (*i.e.*, imposing "chargebacks" in varying amounts but often $45 per week, failing to compensate Kevin Pittman for all hours worked, and failing to reimburse Kevin Pittman's necessary business expenses averaging $2008 per month) resulted in further unlawful reduction of Kevin Pittman's compensation.

169.    Kevin Pittman does not have all the documents or records possessed by Defendants that bear on his damages. Based on his recollection, Kevin Pittman estimates that, in

---

[18] Exceptions to a typical workweek might include days in which work was not performed, *i.e.*, due to weather, a holiday, illness, or otherwise.

a given workweek, he would work 93 hours, 43 hours of which were unpaid; he would be subject to chargebacks of $45 per week; and would be paid $1450, which would be reduced by unreimbursed business expenses of $502 per week.

170.    Kevin Pittman brings claims against DIRECTV.

**Kevin Pyle**

171.    Plaintiff Kevin Pyle is an individual residing in the state of Indiana. Although Kevin Pyle was treated as a W-2 technician of Skylink, under the FLSA he was employed by DIRECTV and DirectSat.

172.    In virtually every workweek between approximately November 2008 and June 2010, Kevin Pyle worked more than 40 hours per week as a technician for DIRECTV and Skylink primarily in the state of Indiana, and also in Ohio, and was unlawfully deprived of overtime compensation.[19]

173.    In fact, Kevin Pyle spent approximately 80 hours per week performing tasks for the benefit of Defendants. Of those 80 hours, 40 hours were spent working for DIRECTV and DirectSat's benefit on tasks not assigned a piece rate and which were thus unpaid.

174.    Defendants' employment policies and practices detailed herein (*i.e.*, imposing "chargebacks" in varying amounts but often ranging between $30 and $60 per week, failing to compensate Kevin Pyle for all hours worked, and failing to reimburse Kevin Pyle's necessary business expenses averaging $633 to $833 per month) resulted in further unlawful reduction of Kevin Pyle's compensation.

175.    Kevin Pyle does not have all the documents or records possessed by Defendants that bear on his damages. Based on his recollection, Kevin Pyle estimates that, in a given

---

[19] Exceptions to a typical workweek might include days in which work was not performed, *i.e.*, due to weather, a holiday, illness, or otherwise.

workweek, he would work 80 hours, 40 hours of which were unpaid; he would be subject to chargebacks of $45 per week; and would be paid $500 per week, which would be reduced by unreimbursed business expenses of $183 per week.

176.    Kevin Pyle brings claims against DIRECTV.

**Adam Schuller**

177.    Plaintiff Adam Schuller is an individual residing in the state of Indiana. Although Adam Schuller was treated as a W-2 technician of Skylink, under the FLSA he was employed by DIRECTV and DirectSat.

178.    In virtually every workweek between approximately August 2009 and January 2011, Adam Schuller worked more than 40 hours per week as a technician for DIRECTV and Skylink primarily in the state of Indiana, and also in Ohio, and was unlawfully deprived of overtime compensation.[20]

179.    In fact, Adam Schuller spent approximately 70 hours per week performing tasks for the benefit of Defendants. Of those 70 hours, 30 hours were spent working for DIRECTV and DirectSat's benefit on tasks not assigned a piece rate and which were thus unpaid.

180.    Defendants' employment policies and practices detailed herein (*i.e.*, imposing "chargebacks" in varying amounts but often ranging between $50 and $75 per week, failing to compensate Adam Schuller for all hours worked, and failing to reimburse Adam Schuller's necessary business expenses averaging $400 to $1000 per month) resulted in further unlawful reduction of Adam Schuller's compensation.

181.    Adam Schuller does not have all the documents or records possessed by Defendants that bear on his damages. Based on his recollection, Adam Schuller estimates that, in

---

[20] Exceptions to a typical workweek might include days in which work was not performed, *i.e.*, due to weather, a holiday, illness, or otherwise.

a given workweek, he would work 70 hours, 30 hours of which were unpaid; he would be subject to chargebacks of $63 per week; and would be paid $750 per week, which would be reduced by unreimbursed business expenses of $175 per week.

182.    Adam Schuller brings claims against DIRECTV.

**Andrew Sinclair**

183.    Plaintiff Andrew Sinclair is an individual residing in the state of Indiana. Although Andrew Sinclair was treated as a W-2 technician of Skylink, under the FLSA he was employed by DIRECTV and DirectSat.

184.    In virtually every workweek between approximately August 2009 and September 2012, Andrew Sinclair worked more than 40 hours per week as a technician for DIRECTV and Skylink in the state of Indiana, and was unlawfully deprived of overtime compensation.[21]

185.    In fact, Andrew Sinclair spent approximately 50 to 60 hours per week performing tasks for the benefit of Defendants. Of those 50 to 60 hours, 10 to 15 hours were spent working for DIRECTV and DirectSat's benefit on tasks not assigned a piece rate and which were thus unpaid.

186.    Defendants' employment policies and practices detailed herein (*i.e.*, imposing "chargebacks" in varying amounts but often ranging between $100 and $150 per week, failing to compensate Andrew Sinclair for all hours worked, and failing to reimburse Andrew Sinclair's necessary business expenses averaging $600 per month) resulted in further unlawful reduction of Andrew Sinclair's compensation.

187.    Andrew Sinclair does not have all the documents or records possessed by Defendants that bear on his damages. Based on his recollection, Andrew Sinclair estimates that,

---

[21] Exceptions to a typical workweek might include days in which work was not performed, *i.e.*, due to weather, a holiday, illness, or otherwise.

in a given workweek, he would work 55 hours, 18 hours of which were unpaid; he would be subject to chargebacks of $125 per week; and would be paid $1200 per week, which would be reduced by unreimbursed business expenses of $150 per week.

188.    Andrew Sinclair brings claims against DIRECTV and DirectSat.

**Rick Weingart**

189.    Plaintiff Rick Weingart is an individual residing in the state of Indiana. Although Rick Weingart was treated as an independent contractor, under the FLSA he was employed by DIRECTV and DirectSat.

190.    In virtually every workweek between approximately August 2009 and January 2012, Rick Weingart worked more than 40 hours per week as a technician for DIRECTV and Skylink primarily in the state of Indiana, and was unlawfully deprived of overtime compensation.[22]

191.    In fact, Rick Weingart spent approximately 75 hours per week performing tasks for the benefit of Defendants. Of those 75 hours, 15 hours were spent working for DIRECTV and DirectSat's benefit on tasks not assigned piece rate and which were thus unpaid.

192.    Defendants' employment policies and practices detailed herein (*i.e.*, imposing "chargebacks" in varying amounts but often ranging between $24 and $48 per week, failing to compensate Rick Weingart for all hours worked, and failing to reimburse Rick Weingart's necessary business expenses averaging $400 per month) resulted in further unlawful reduction of Rick Weingart's compensation.

193.    Rick Weingart does not have all the documents or records possessed by Defendants that bear on his damages. Based on his recollection, Rick Weingart estimates that, in

---

[22] Exceptions to a typical workweek might include days in which work was not performed, *i.e.*, due to weather, a holiday, illness, or otherwise.

a given workweek, he would work 75 hours, 15 hours of which were unpaid; he would be subject to chargebacks of $36 per week; and would be paid $800 per week, which would be reduced by unreimbursed business expenses of $100 per week.

194.   Rick Weingart brings claims against DIRECTV and DirectSat.

**William Woodcock**

195.   Plaintiff William Woodcock is an individual residing in the state of Indiana. Although William Woodcock was treated as a W-2 technician, under the FLSA he was employed by DIRECTV and DirectSat.

196.   In virtually every workweek between approximately August 2009 and February 2012, William Woodcock worked more than 40 hours per week as a technician for DIRECTV and Skylink primarily in the state of Indiana, and also in West Virginia and Kentucky, and was unlawfully deprived of overtime compensation.[23]

197.   In fact, William Woodcock spent approximately 60 hours per week performing tasks for the benefit of Defendants. Of those 60 hours, 20 hours were spent working for DIRECTV and DirectSat's benefit on tasks not assigned a piece rate and which were thus unpaid.

198.   Defendants' employment policies and practices detailed herein (*i.e.*, imposing "chargebacks" in varying amounts but often $30 per week, failing to compensate William Woodcock for all hours worked, and failing to reimburse William Woodcock's necessary business expenses averaging $320 per month) resulted in further unlawful reduction of William Woodcock's compensation.

---

[23] Exceptions to a typical workweek might include days in which work was not performed, *i.e.*, due to weather, a holiday, illness, or otherwise.

199.    William Woodcock does not have all the documents or records possessed by Defendants that bear on his damages. Based on his recollection, William Woodcock estimates that, in a given workweek, he would work 60 hours, 20 hours of which were unpaid; he would be subject to chargebacks of $30 per week; and would be paid $600 per week, which would be reduced by unreimbursed business expenses of $80 per week.

200.    William Woodcock brings claims against DIRECTV.

**Ryan Yandell**

201.    Plaintiff Ryan Yandell is an individual residing in the state of Oklahoma. Although Ryan Yandell was treated as a W-2 technician of Skylink, under the FLSA he was employed by DIRECTV and DirectSat.

202.    In virtually every workweek between approximately March 2011 and June 2011, Ryan Yandell worked more than 40 hours per week as a technician for DIRECTV and Skylink in the state of Indiana, and was unlawfully deprived of overtime compensation.[24]

203.    In fact, Ryan Yandell spent approximately 70 to 80 hours per week performing tasks for the benefit of Defendants. Of those 70 to 80 hours, 10 to 20 hours were spent working for DIRECTV and DirectSat's benefit on tasks not assigned a piece rate and which were thus unpaid.

204.    Defendants' employment policies and practices detailed herein (*i.e.*, failing to compensate Ryan Yandell for all hours worked) resulted in further unlawful reduction of Ryan Yandell's compensation.

205.    Ryan Yandell does not have all the documents or records possessed by Defendants that bear on his damages. Based on is recollection, Ryan Yandell estimates that, in a

---

[24] Exceptions to a typical workweek might include days in which work was not performed, *i.e.*, due to weather, a holiday, illness, or otherwise.

given workweek, he would work 75 hours, 15 hours of which were unpaid and he would be paid $350 per week.

206.    Ryan Yandell brings claims against DIRECTV.

**David Yarlot**

207.    Plaintiff David Yarlot is an individual residing in the state of Indiana. Although David Yarlot was treated as a W-2 technician of Skylink, under the FLSA he was employed by DIRECTV and DirectSat.

208.    In virtually every workweek between approximately June 2006 and April 2011, David Yarlot worked more than 40 hours per week as a technician for DIRECTV and Skylink in the state of Indiana, and was unlawfully deprived of overtime compensation.[25]

209.    In fact, David Yarlot spent approximately 60 hours per week performing tasks for the benefit of Defendants. Of those 60 hours, 20 hours were spent working for DIRECTV and DirectSat's benefit on tasks not assigned a piece rate and which were thus unpaid.

210.    Defendants' employment policies and practices detailed herein (*i.e.*, imposing "chargebacks" in varying amounts but often ranging between $66 and $132 per week, failing to compensate David Yarlot for all hours worked, and failing to reimburse David Yarlot's necessary business expenses averaging $320 to $420 per month) resulted in further unlawful reduction of David Yarlot's compensation.

211.    David Yarlot does not have all the documents or records possessed by Defendants that bear on his damages. Based on his recollection, David Yarlot estimates that, in a given workweek, he would work 60 hours, 20 hours of which were unpaid; he would be subject to

---

[25] Exceptions to a typical workweek might include days in which work was not performed, *i.e.*, due to weather, a holiday, illness, or otherwise.

chargebacks of $99 per week; and would be paid $750 per week, which would be reduced by unreimbursed business expenses of $93 per week.

212.    David Yarlot brings claims against DIRECTV.

**John Lindsay**

213.    Plaintiff John Lindsay is an individual residing in the state of Indiana. Although John Lindsay was treated as a W-2 technician of Skylink, under the FLSA he was employed by DIRECTV and DirectSat.

214.    In virtually every workweek between approximately 2009 and September 2012, John Lindsay worked more than 40 hours per week as a technician for DIRECTV and Skylink in the state of Indiana, and was unlawfully deprived of overtime compensation.[26]

215.    In fact, John Lindsay spent approximately 45 to 50 hours per week performing tasks for the benefit of Defendants. Of those 45 to 50 hours, 15 to 20 hours were spent working for DIRECTV and DirectSat's benefit on tasks not assigned a piece rate and which were thus unpaid.

216.    Defendants' employment policies and practices detailed herein (*i.e.*, imposing "chargebacks" in varying amounts but often $15 per week, failing to compensate John Lindsay for all hours worked, and failing to reimburse John Lindsay's necessary business expenses of $400 per month) resulted in further unlawful reduction of John Lindsay's compensation.

217.    John Lindsay does not have all the documents or records possessed by Defendants that bear on his damages. Based on his recollection, John Lindsay estimates that, in a given workweek, he would work 48 hours per week, 18 hours of which were unpaid; he would be

---

[26] Exceptions to a typical workweek might include days in which work was not performed, *i.e.*, due to weather, a holiday, illness, or otherwise.

subject to chargebacks of $15 per week; and would be paid $600 per week, which would be reduced by unreimbursed business expenses of $100 per week.

218.    John Lindsay brings claims against DIRECTV and DirectSat.

**Robert Landrum**

219.    Plaintiff Robert Landrum is an individual residing in the state of Indiana. Although Robert Landrum was treated as a W-2 technician of Skylink, under the FLSA he was employed by DIRECTV and DirectSat.

220.    In virtually every workweek between approximately June 2010 and September 2012, Robert Landrum worked more than 40 hours per week as a technician for DIRECTV and Skylink in the state of Indiana, and was unlawfully deprived of overtime compensation.[27]

221.    In fact, Robert Landrum spent approximately 63 hours per week performing tasks for the benefit of Defendants. Of those 63 hours, 23 hours were spent working for DIRECTV and DirectSat's benefit on tasks not assigned a piece rate and which were thus unpaid.

222.    Defendants' employment policies and practices detailed herein (*i.e.*, imposing "chargebacks" in varying amounts but often $15 per week, failing to compensate Robert Landrum for all hours worked, and failing to reimburse Robert Landrum's necessary business expenses) resulted in further unlawful reduction of Robert Landrum's compensation.

223.    Robert Landrum does not have all the documents or records possessed by Defendants that bear on his damages. Based on his recollection, Robert Landrum estimates that, in a given workweek, he would work 63 hours, 23 hours of which were unpaid; he would be subject to chargebacks; and would be paid $450 per week, which would be reduced by unreimbursed business expenses.

---

[27] Exceptions to a typical workweek might include days in which work was not performed, *i.e.*, due to weather, a holiday, illness, or otherwise.

224.    Robert Landrum brings claims against DIRECTV and DirectSat.

## COUNT I

### Violation of the Fair Labor Standards Act of 1938

*By each Plaintiff individually against Plaintiff's previously identified Defendant(s)*

225.    Plaintiffs re-allege all allegations set forth above.

226.    At all times material herein, Plaintiffs have been entitled to the rights, protections, and benefits provided under the FLSA, 29 U.S.C. §§ 201, *et seq.*

227.    The FLSA regulates, among other things, the payment of overtime pay by employers whose employees are engaged in interstate commerce, or engaged in the production of goods for commerce, or employed in an enterprise engaged in commerce or in the production of goods for commerce. 29 U.S.C. § 207(a)(1).

228.    The FLSA also regulates, among other things, the payment of minimum wage by employers whose employees are engaged in interstate commerce, or engaged in the production of goods for commerce, or employed in an enterprise engaged in commerce or in the production of goods for commerce.  29 U.S.C. § 206(a).

229.    Defendants are subject to the minimum wage and overtime pay requirements of the FLSA because they are enterprises engaged in interstate commerce and their employees are engaged in commerce.

230.    Defendants violated the FLSA by failing to pay all minimum wage and overtime wages due to Plaintiffs, failing to properly calculate Plaintiffs' regular rate of pay for determining the overtime premium pay owed, and improperly deducting money from Plaintiffs' pay.

231.   As to defendant DIRECTV, Plaintiffs are entitled to damages equal to the mandated minimum wage and overtime premium pay within the three years preceding the filing their consent to join forms in the *Lang* or *Arnold* litigation, plus periods of equitable tolling,[28] because DIRECTV acted willfully and knew or showed reckless disregard in their violation of the FLSA.

232.   As to the Provider Defendant(s) against which each Plaintiff makes a claim, Plaintiffs are entitled to damages equal to the mandated minimum wage and overtime premium pay within the three years preceding the filing their (1) original *Acfalle* complaint, *i.e.*, November 1, 2013,[29] (2) filing this original complaint, *i.e.*, October 21, 2014[30] or (3) filing this amended complaint,[31] plus periods of equitable tolling, because Provider Defendant(s) acted willfully and knew or showed reckless disregard in its violation of the FLSA.

233.   Pursuant to Defendants' policies and practices, Defendants willfully violated the FLSA by refusing and failing to pay Plaintiffs overtime and minimum wages. In the course of perpetrating these unlawful practices, Defendants willfully failed to keep accurate records of all hours worked by, compensation paid to, and expenses incurred by Plaintiffs.

---

[28] Former *Arnold* Plaintiffs Dave Crawford, Shane Harris, Anthony Hermiller, Herman Kluesner, Christopher Long, Kevin Pittman, Kevin Pyle, Adam Schuller, Andrew Sinclair, Rick Weingart, William Woodcock, Ryan Yandell, David Yarlot, John Lindsay, and Robert Landrumare entitled to an additional six months of tolling on their claims against DIRECTV per the law of the case. The *Arnold* court ordered a period of tolling on the running of the opt-ins' limitations period during a discovery stay while DIRECTV's motion to dismiss was pending. (*Arnold* Docs 46, 49). The period of tolling was 180 days, which, added to the applicable three year period gives former *Arnold* Plaintiffs' claims against DIRECTV a three-and-a-half year lookback from the date each opt-in joined that action.

[29] Plaintiffs Brian Delgado, Justin Goodman, Tracey Hashman, Gary Missi, and William Snyder.

[30] Plaintiffs Dave Crawford, Shane Harris, Anthony Hermiller, Christopher Long, Andrew Sinclair, and Rick Weingart.

[31] Plaintiffs Robert Landrum and John Lindsay.

234.    Defendants' unlawful conduct was willful because, among other reasons described herein, DIRECTV and other members of the Provider Network knew, or should have known, that the fissured employment scheme utilized a piece-rate system(s) that unlawfully denied Plaintiffs minimum wage, overtime wage, and other employment benefits. Those systems have been challenged in numerous lawsuits around the country in which DIRECTV, DirectSat, Multiband, as well as other HSP members of DIRECTV's Provider Network, have all been defendants. Indeed DIRECTV is currently a defendant in a lawsuit brought the U.S. Department of Labor in the United States District Court for the Western District of Washington challenging its (1) status as an employer of technicians like the plaintiffs herein and (2) the piece-rate compensation system. The system being challenged in that case is essentially identical to the system(s) being challenged in this case.

235.    Defendants have acted neither in good faith nor with reasonable grounds to believe that their actions and omissions were not a violation of the FLSA. As a result thereof, Plaintiffs are each entitled to recover an award of liquidated damages in an amount equal to the amount of unpaid wages as described by Section 16(b) of the FLSA, codified at 29 U.S.C. § 216(b). Alternatively, should the Court find Defendants acted in good faith in failing to pay Plaintiffs minimum wage and overtime compensation, Plaintiffs are each entitled to an award of prejudgment interest at the applicable legal rate.

236.    As a result of these violations of the FLSA's minimum wage and overtime pay provisions, compensation has been unlawfully withheld from Plaintiffs by Defendants. Accordingly, pursuant to 29 U.S.C. § 216(b), Defendants are liable for the unpaid minimum wages and overtime premium pay along with an additional amount as liquidated damages, pre-judgment and post-judgment interest, reasonable attorneys' fees, and costs of this action.

237. Plaintiffs request relief as described below and as permitted by law.

**WHEREFORE**, Plaintiffs demand a jury trial for all issues so triable, and request the Court enter judgment for Plaintiffs individually and:

    a. Award damages for unpaid minimum wages and unpaid overtime wages under 29 U.S.C. § 216(b);

    b. Award liquidated damages under 29 U.S.C. § 216(b);

    c. Award reasonable attorneys' fees under the Fair Labor Standards Act;

    d. Award costs of suit under 29 U.S.C. § 216(b);

    e. Award pre-judgment interest;

    f. Award damages including wages or other compensation lost as a result of the misclassification; and

    g. Grant any further relief that the Court may deem just and equitable.

Dated: March 18, 2015                Respectfully submitted,

**STUEVE SIEGEL HANSON LLP**

By:   s/George A. Hanson
      George A. Hanson, *Admitted PHV*
      MO Bar No. 43450
      460 Nichols Road, Suite 200
      Kansas City, Missouri 64112
      Telephone:    816-714-7100
      Facsimile:    816-714-7101
      Email: hanson@stuevesiegel.com

      Ryan D. O'Dell, *Admitted PHV*
      CA Bar No. 290802
      500 West C Street, Suite 1750
      San Diego, California 92101
      Telephone:    619-400-5826
      Facsimile:    619-400-5832
      Email: odell@stuevesiegel.com

**LEAR WERTS LLP**
Bradford B. Lear, *Admitted PHV*
Mo. Bar No. 53204
Email: lear@learwerts.com
Todd C. Werts, *Admitted PHV*
Mo. Bar No. 53288
Email: werts@learwerts.com
2003 W. Broadway, Ste. 107
Columbia, Missouri 65203
Telephone:      573-875-1991
Facsimile:      573-875-1985

*Attorneys for Plaintiffs*

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF INDIANA**

BRIAN DELGADO, et al.,

                      Plaintiffs,

    v.                                Case No.  1:14-CV-1722 SEB-DML

DIRECTV, INC., et al.,

                      Defendants.

## <u>CERTIFICATE OF SERVICE</u>

       I hereby certify that on March 18, 2015, I caused the foregoing First Amended Complaint to be filed electronically with this Court, where it is available for viewing and downloading from the Court's ECF system, and that such electronic filing automatically generates a Notice of Electronic Filing constituting service of the filed document, upon interested parties.


                    /s/ George A. Hanson
                    George A. Hanson
                    *Counsel for Plaintiffs*


Dated:  March 18, 2015